MEMORANDUM OF DECISION
On July 22, 1997, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Barbara C. and Christopher W. to their two children, Diane and Christopher. A trial on the petitions took place over five days, ending on May 4, 1999. For the reasons stated below, the court does not find termination to be in the children's best interests. The court orders that guardianship of the children be transferred to the children's paternal great-grandmother, Dorothy B. From the evidence presented, the court finds the following facts:
 A. FACTS
Diane, the oldest of these two children, was born on April 1, 1992, when Barbara C. was fifteen and a half years old. Despite the enormous difficulty of caring for a child while she herself was still a child, Barbara kept both Diana and Christopher, born September 12, 1993 in her care with the help of relatives. Barbara herself is the fifth of sixth children and completed her education through the ninth grade. Her family is well-known to DCF and Barbara herself spent some time in foster care. Barbara had a long term relationship with the father of the CT Page 6842 children, Christopher W., which began when she was fourteen years old. The father, however, was never involved in any meaningful way with the children. He left Hartford in 1994. In that same year, Barbara's mother, with whom she had a difficult relationship, also left the area.
In 1993 and 1994 Barbara lived in various shelters with her children. Referrals by others to DCF concerning her treatment of the children began in 1993. In August, 1994, Barbara was asked to leave a shelter because the shelter workers reported that she did not follow the rules and was not feeding or supervising her children. The shelter also reported that she was physically abusive to her children, striking Christopher in the chest on one occasion, and knocking him down. She had then and continues to have problems with her anger and managing the explosive behavior that results when she is angry. On August 26, 1994, the children were removed from her care by DCF because of her homelessness and her improper care of them. On December 13, 1994, they were adjudicated neglected children and committed to the care of DCF. They have remained in the custody of DCF and in foster care since that time. Since the end of her relationship with Christopher W., Barbara has been involved in another long term relationship with Timothy B., the father of her two youngest children, not subject to these petitions.
At trial, Barbara, through her counsel, stipulated that at the time of the filing of the termination petitions, she had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives. Connecticut General Statutes § 17a-112 (c)(3)(B). She had not completed anger management counseling, secured her GED or addressed the issues of homelessness and securing income. Barbara expressly did not stipulate that she had failed to rehabilitate at the time of trial, although she did admit she was not in a position to care for her children during her testimony at trial. She believed that her children should continue to be cared for by their paternal great-grandmother, but that her parental rights should not be terminated.
As a result of Barbara's stipulation, the factual inquiry for the court as to Barbara is limited to the time since the filing of the termination petitions in July, 1997 to the present time. With regard to the services offered to Barbara, Barbara claimed CT Page 6843 that DCF failed to assist her with relevant services from 1996 to the present time.[2] Unfortunately, however, Barbara did not cooperate with DCF and the offered service providers when neglect petitions were filed. Initially, prior to 1997, the record reflects that Barbara was referred to a number of services suited to the problems facing her, including parent support groups and case management with the Child Development Resource Program, the Salvation Army Young Parents Program for parenting education, GED classes and the Village for Children and Families for counseling. She also received bus passes for transportation and visitation with her children. Nonetheless, the court also credits the testimony of other service providers that DCF did not assist Barbara in a supportive way. As was stated by Brenda Lammie, of the Hartford Child Development
Program:
 "When you work with families, you need to provide them with an atmosphere of encouragement, support and services to reach the goals. . . . Our families are expected to act in a particular manner and the professionals are required to do the same.'"
While Ms. Lammie stated that Barbara's behaviors were at times difficult, she believed that DCF also contributed to the chaotic relationship that existed and was not supportive of Barbara.[3] They treated her with disrespect. Ms. Lammie testified it was the policy of her agency to try to work with DFC as a team for clients. It was not possible in Barbara's case, she stated. Nonetheless, by court order on June 11, 1996, continuing efforts to reunify the children with their family were found not appropriate. (Keller, J.). Therefore, since prior to the filing of the termination petitions, DCF was no longer under its usual statutory mandate pursuant to Connecticut General Statutes17a-112 (c)(1) to make reasonable reunification efforts.
Barbara was referred to counseling by DCF, first at Catholic Family Services and then to the Village for Families, where she forged a connection to Ms. Al-Sagaf, a counselor there. She continues to see Ms. Al-Sagaf, despite Ms. Al-Sagaf's retirement and is now her only client. Ms. Al-Sagaf testified that Barbara does indeed have significant problems with anger management, but that in the years since she began to see her in 1996, Barbara has made progress in learning techniques to help her deal with her anger in more appropriate ways. Barbara has more work to do, but there has been change for the better. CT Page 6844
Her anger and inability to control her anger led to outbursts at DCF. Both Barbara and the DFC social worker then on her case testified to an administrative case review which occurred in the DCF offices in February, 1998. When Barbara overheard the foster parents for a younger child of hers, Talyhia, speak about wanting to adopt the child when they thought she was not listening, she became very angry. At the conclusion of the ACR, as she stated, she "let fly some fairly intense language." She did some of this in front of her children, with whom she had a supervised visitation session. The social worker, Ms. Howard, also testified that there was one other occasion during visitation when Barbara was extremely angry and did not shield her children from her behavior.
The biggest concern, however, has been with Barbara's relationship with Timothy B., the father of her youngest two children. That relationship has been marred by anger and domestic violence with several arrests and protective orders entered regarding their explosions[4]. In March, 1997 after a fight with Timothy, Barbara was arrested for assault and for reckless burning when she burned some clothing in the apartment in which both she and Tim were residing. She has twice been incarcerated during the time of DCF's involvement with her, in 1994 and 1997. The social worker also testified to a visitation incident when Tim was helping to put the children in the car in which they were being transported. Barbara became angry at how he placed them in the car and kicked him hard twice. At one time, in order to keep her youngest child with her, Barbara was required by the court to have other housing. She stayed with a relative for a short period of time. Barbara testified that the move disrupted after a few days because her relative expected her to pay rent, which she could not do. The DCF records reflects that the argument required police intervention. The testimony demonstrates that for most of the past three years, Barbara resided with Timothy B. and continued a relationship marked with anger and domestic violence. It is not clear that the relationship has ended at the present time, although the couple is no longer living together.
While drug abuse has not officially been an issue in the DCF case, it is now a serious concern to Barbara. She admits to using marijuana. Since April, 1999 Barbara resides at Coventry House, an inpatient drug and alcohol abuse facility where mothers can reside with their young children while receiving intensive treatment. She resides there with her youngest child, born in CT Page 6845 early 1999. She believes the intensive residential treatment is necessary for her.[5] Barbara expects to be at Coventry House for a year. There, she testified, she is able to work on many of the issues troubling her, including anger-management.
Also of concern to DCF was Barbara's failure to hold regular employment. In July, 1997, DCF secured employment for Barbara at One Chain, where she worked for a number of months before leaving, due to her claim of sexual harassment. On her own, Barbara secured employment in a youth program to teach construction skills and to provide employment to young people. She retained this position for about eight months. She is not expected to have employment at the present while in the Coventry House as she participates in group and individual counseling sessions most of the day. She does not claim to be able to care for her two oldest children, but opposes the termination of her parental rights and believes the children should remain in the care of their great-grandmother.
The children, in the meantime, have also had some significant problems., After two placements, in October, 1995, they came to live with their paternal great-grandmother, Dorothy B. Mrs. B. has had a hand in raising many of her grandchildren, including Christopher W., the children's father, and is now willing to undertake the care of the next generation. While in her care, Diane has had the easier time of the two children. Nonetheless, she has been identified as having auditory verbal learning disabilities and probable ADHD. She is receiving counseling through the Manchester Child Guidance Clinic and progressing well.
Christopher, however, after the initial adjustment to his great-grandmother's home, began to act in aggressive ways and became difficult to control. In September 1998, because of his disruptive behavior, he began attending the Elmcrest Clinical Day school. Twice in August and September 1998, his behaviors caused his psychiatric hospitalization there. He was diagnosed with attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder and is receiving medication for his conditions. Both children have required considerable effort on the part of their great-grandmother, due to their challenging behaviors. Despite their specialized needs and these difficulties, Ms. B. is willing to either adopt them, if there is no other option, or have their guardianship transferred to her. She will also permit Barbara, their mother, to have access to the children, regardless CT Page 6846 of the outcome of the pending petitions.
The two children and their great-grandmother were evaluated by a court-appointed psychologist during the course of the trial. The children and their mother had earlier been so evaluated. Dr. Robert Meier, the clinical psychologist performing the evaluation, found that both children see their great-grandmother as their primary caretaker. He felt that she was able to control them and that permanency was the crucial issue for both of them. He knew of Christopher's diagnosis and believed that he did fit the diagnostic profile of an ADHD child. He noted that Christopher demonstrated poor impulse control difficulty in tending to tasks, low frustration tolerance and an inability to cope with change. He noted that there had been significant improvement since his course of medication had begun. He also noted that Ms. B. had been concerned about seeking help for the children through DCF as she believed that the children might be removed from her. He recommended that she receive greater assistance with services, including respite care, to enable her to care for the children. Dr. Meier testified that moving these two children to another home and new foster parents would be extremely disruptive to them. This is so because Christopher and Diane have greater needs for stability and permanency and the average children. In addition, the sense of trust they have developed while with their great-grandmother should not be disrupted. Particularly for Christopher, any move to another setting could derail the progress he has made. Such a move would not be in either child's best interests.
 B. ADJUDICATION 1. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent,. . . . provided that such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112 (c)(1). As previously noted, this finding was made for both children on June 11, 1996. From the testimony and the evidence, the court concludes that DCF had made reasonable reunification I efforts prior to that time in terms of the services to which Barbara had been referred. The court has noted that the relationship between Barbara and DCF was strained. While CT Page 6847 it appears Barbara could have used a more supportive approach to encourage her to participate, this observation does not negate that referrals were made and services provided. In the termination petitions, DCF alleges that there had been a court order finding that further reunification efforts were not appropriate and that neither parent was willing or able to benefit from reunification efforts. The court finds from the clear and convincing evidence that these allegations have been proven as to both Barbara C. and Christopher W.
2. Adjudicatory Findings
The court finds, by clear and convincing evidence, that as of July 22, 1997, Christopher W. had abandoned these children. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). He was never involved with these children and did not take any steps to maintain such contact as was available to him. For almost four years, the children have been with his grandmother, the individual who raised him and long distance contact would have been possible. The court concludes that as to this absent father, DCF did make reasonable efforts to contact him and determine the level of his interest in the children. The facts supporting abandonment have also been in existence for over a year when the petitions were filed. The petitions also allege that there is no ongoing parent-child relationship between these children and their biological father. The court so finds from the clear and convincing evidence.
Abandonment was also alleged against Barbara C. DCF did not pursue this claim at trial and the court treats it as abandoned. The evidence is clear that Barbara visited her children I regularly with some exceptions and that she has never abandoned them, in the legal sense of this term. However, the court does find, by clear and convincing evidence, that as of July 22, 1997, Barbara had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives. Connecticut General Statutes § 17a-112 (c)(3)(B). She has stipulated to this finding, which is apparent from the evidence. She remains unable to care for them at the present time, although she is making progress CT Page 6848 toward rehabilitation. She believes that it is appropriate that the children continue to be cared for by their great-grandmother, but that her rights to them should not be terminated. She believes that she has met the court expectations, including completing parenting classes and she is about to get her GED. Fundamentally, she argues that it is in the children's best interest that they stay with their great-grandmother and that termination under these circumstances is not in their best interests.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194,203, 504 A.2d 532 (1986), see also; In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795 (1984). Barbara will not be rehabilitated within the immediately foreseeable future. The court finds, based on the clear and convincing evidence, this ground had existed for longer than one year prior to the filing of the termination petitions.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were provided by DCF to the family. Those services include services to benefit the children, case management services, supervised visitation and transportation coordination. There were referrals for counseling, anger management, parenting and for education prior to 1996. There were no services offered to the biologicafather, as he was unavailable to receive them.
2) Despite its finding that the court has determined at a prior hearing that further reunification efforts are no longer appropriate, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family under all the circumstances prior to the entry of the court orders ending such efforts.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Barbara. She appears to have completed many of them, but requires more work regarding anger management CT Page 6849 and drug abuse. None were set for the biological father due to his lack of involvement in the children' lives.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. Diane and Christopher are doing well with their great-grandmother. They have known no other nurturing home and have lived there most of their short lives. Neither child expresses much interest or concern about their biological mother. Their great-grandmother would like their guardianship transferred to her and will adopt them, if their parents' rights to them are terminated.
5) Finding regarding the ages of the children. Diane is seven and Christopher will be six on September 2, 1999. He is now five years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parent has maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As detailed above, the court finds that the biological father of the children has made no changes in his life to accommodate the care and nurturing of these two children. The most recent information available appears to indicate that he is incarcerated in Florida. Barbara has begun to grow up and make the required internal personal changes to care for her children, but knows she cannot care for Diane and Christopher now and knows their most important day-to-day connection is with their great-grandmother.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children, or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. While economic circumstances in the past have made it difficult for Barbara to maintain adequate housing and Barbara's CT Page 6850 lack of education has made employment elusive, DCF also took steps to encourage and help her, which help she refused. The father of the children was not present and not willing to help in the care of the children.
 D. DISPOSITION
Once the court finds that the allegations of the termination petitions have been proven by clear and convincing evidence, the court in the second or dispositional phase of the proceedings must also find that termination is in the children's best interests. In re Roshawn R., 51 Conn. App. 44, 52. 720 A.2d 1112
(1998). The children have been in the care of their great-grandmother for well over three years, more than half of Christopher's life. They are in need of a permanent placement, a placement which assures the continuity and consistency of their care and permits them to maintain the sense of security they have developed with their great-grandmother. Their father is no closer now to making the necessary personal changes to parent them than he was when the children were removed by DCF. Their mother has made some progress. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." Inre Juvenile Appeal (84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). In addition, "because of the psychological effects of prolonged termination proceedings on young children, time is of the essence." In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992).
There is no doubt that it is in Diane and Christopher's best interests that their great-grandmother should have the legal right to provide for them and they should have permanency. But unclarified by the social study, by the testimony of the primary witnesses, and by counsel is why it would be in these children's best interests to sever their legal connection to their mother and father. Diane and Christopher would have permanency with the continued and assured care from their great-grandmother, who knows both their mother and father. Continuing to see their mother or even their absent father as a visiting resource will not prevent or inhibit the primary attachment these children have to their great-grandmother. For these children, whose future is uncertain and whose care requirements are extraordinary, the more people who know them and are concerned about them, the better. Based upon the foregoing, the court finds that it is not in the best interests of these children that the rights of their biological parents to them be terminated at this time. CT Page 6851 Accordingly, the termination petitions are dismissed.
The court finds that the disposition most in the children's best interest would be a transfer of guardianship for these two children to their paternal great-grand mother. There remain some unanswered issues for the great-grandmother. She may or may not be eligible to benefit from a subsidized transfer of guardianship. Her eligibility must be determined prior to the entry of any court order transferring guardianship. Mrs. B. may also be eligible for certain services to support her in the care of these two children.
The court finds from the evidence that is it in the best interests of the children to remain committed to the Department of Children and Families and to be in the foster care of their paternal great grandmother until such time as the subsidized guardianship application matter has been determined or an additional period of six months from the date of this decision, whichever is less. The court orders a transfer of guardianship of Diane and Christopher to their paternal great- grandmother, effective upon the completion of the subsidized guardianship application and its approval or rejection. The court further directs DCF to assist Dorothy B. with such application and with any necessary support services she requires.
Barbara M. Quinn, Judge Child Protection Session